

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MORRIS LEE RANDALL, JR.,

    Petitioner,

v.                               Civil Action No. 3:14CV562

HAROLD W. CLARKE,

    Respondent.

### MEMORANDUM OPINION

Morris Lee Randall, Jr., a Virginia state prisoner proceeding pro se, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1) challenging his convictions in the Circuit Court of the County of King William ("Circuit Court"). Respondent has moved to dismiss, inter alia, on the ground that the one-year statute of limitations governing federal habeas petitions bars the § 2254 Petition. Randall has responded. The matter is ripe for disposition. For the reasons that follow, the Court will grant Respondent's Motion to Dismiss and the § 2254 Petition will be denied.

### I.   PROCEDURAL HISTORY

#### A.   State Court Proceedings

On September 1, 2006, a jury convicted Randall of first-degree felony murder, attempted robbery, conspiracy to commit robbery, use of a firearm in the commission of a felony, second offense, and possession of a firearm by a person convicted of a

violent felony. Commonwealth v. Randall, No. CR06-20(00)-(04), at 1-2 (Va. Cir. Ct. Sept. 27, 2006). On September 27, 2006, the Circuit Court sentenced Randall to forty-seven years of incarceration. Id. at 2-3.

Randall appealed. On January 8, 2008, the Supreme Court of Virginia refused Randall's petition for appeal. Randall v. Commonwealth, No. 071329, at 1 (Va. Jan. 8, 2008).

Prior to the conclusion of his direct appeal, on February 22, 2007, Randall filed a petition for a writ of habeas corpus in the Circuit Court. Petition for Writ of Habeas Corpus at 1, Randall v. Johnson, No. CL07-22 (Va. Cir. Ct. filed Feb. 22, 2007). Randall subsequently moved to withdraw the petition pending the resolution of his direct appeal. On August 22, 2007, the Circuit Court dismissed the petition without prejudice. Randall v. Johnson, No. CL07-22 (Va. Cir. Ct. Feb. 22, 2007).

On January 8, 2009, Randall filed his second petition for writ of habeas corpus in the Circuit Court. Petition for Writ of Habeas Corpus at 1, Randall v. Johnson, No. CL09-01 (Va. Cir. Ct. Jan. 8, 2009). On September 2, 2009, the Circuit Court denied the petition. Randall v. Johnson, No. CL09-01, at 28 (Va. Cir. Ct. filed Sept. 2, 2009.) After the Circuit Court denied the petition, Randall filed his untimely reply brief to the Respondent's Motion to Dismiss. The Circuit Court noted

that Randall's reply was tardy, but nevertheless, reviewed it, and again denied Randall's habeas petition. Randall v. Johnson, No. CL09-01, at 1 (Va. Cir. Ct. Sept. 23, 2009). Randall noted an appeal, Notice of Appeal at 1, Randall v. Johnson, No. CL09-01 (Va. Cir. Ct. filed Sept. 30, 2009), but failed to pursue his appeal in the Supreme Court of Virginia.

## B. Federal Habeas Petition

On July 31, 2014, Randall filed his § 2254 Petition in this Court. (§ 2254 Pet. 15.)[1] In the § 2254 Petition, Randall argues entitlement to relief upon the following grounds:

Claim One: Counsel rendered ineffective assistance by "fail[ing] to investigate Floyd Green, Eric Berkley, and Sydney Travors to determine if matters of defense could be developed." (§ 2254 Pet. 6.)

Claim Two: Counsel rendered ineffective assistance by "fail[ing] to locate and interview Charles Surles to determine if matters of defense could be developed." (Id. at 7.)

Claim Three: Counsel rendered ineffective assistance by "fail[ing] to investigate and obtain the telephone records of alibi witness Hattie Mae Williams." (Id. at 9.)

---

[1] The Court deems the petition filed on the date Randall swears he placed the petition in the prison mailing system. Houston v. Lack, 487 U.S. 266, 276 (1988).

3

Claim Four:     Randall is actually innocent, and was convicted
                "based on trial counsel's failure to conduct an
                adequate investigation." (Id. at 11.)

## II. ANALYSIS

### A. Statute of Limitations

Respondent contends that the federal statute of limitations

bars Randall's claims.[2]    Section 101 of the Antiterrorism and

Effective Death Penalty Act ("AEDPA") amended 28 U.S.C. § 2244

to establish a one-year period of limitation for the filing of a

petition for a writ of habeas corpus by a person in custody

pursuant to the judgment of a state court.    Specifically, 28

U.S.C. § 2244(d) now reads:

1.   A 1-year period of limitation shall apply to an
     application for a writ of habeas corpus by a
     person in custody pursuant to the judgment of a
     State court.   The limitation period shall run
     from the latest of--

     (A)   the date on which the judgment became
           final by the conclusion of direct
           review or the expiration of the time
           for seeking such review;

     (B)   the date on which the impediment to
           filing an application created by State
           action in violation of the Constitution
           or laws of the United States is
           removed, if the applicant was prevented
           from filing by such State action;

     (C)   the date on which the constitutional
           right asserted was initially recognized

_____

[2] Randall freely admits that he "failed to exhaust [his]
claim[s]" in state court but argues that his actual innocence
excuses his procedural default (§ 2254 Pet. 7) and the
untimeliness of his petition. (Id. at 14.)

4

> by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> 2. The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

## B. Commencement of the Statute of Limitations Under 28 U.S.C. § 2244(d)(1)(A)

Randall's judgment became final on Monday, April 7, 2008, when the time to file a petition for a writ of certiorari expired. Hill v. Braxton, 277 F.3d 701, 704 (4th Cir. 2002) ("[T]he one-year limitation period begins running when direct review of the state conviction is completed or when the time for seeking direct review has expired . . . ." (citing 28 U.S.C. § 2244(d)(1)(A))); see Sup. Ct. R. 13(1) (petition for certiorari should be filed within ninety days of entry of judgment by state court of last resort or of the order denying discretionary review). The limitation period ran for 275 days, until January 8, 2009, when Randall filed his second state habeas petition. See 28 U.S.C. § 2244(d)(2).

The limitation period remained tolled until September 23, 2009, when the Circuit Court dismissed Randall's second habeas petition.[3] Randall filed no appeal of that decision. Accordingly, the limitation period then ran for more than four and a half additional years before Randall filed his § 2254 Petition on July 31, 2014. Randall does not suggest any plausible basis for a belated commencement of the limitation period under 28 U.S.C. § 2244(d)(1)(B)-(D) or equitable tolling. Instead, he argues that his actual innocence excuses his failure to file in a timely manner.

### III. ACTUAL INNOCENCE

#### A. Legal Standard

The Supreme Court has recognized actual innocence as a basis for overcoming the expiration of the statute of limitations. See McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013) (explaining that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations"). "Claims of actual innocence, whether presented as freestanding ones or merely as gateways to excuse a

___

[3] The limitations period may have started to run again on September 3, 2009, the day after the Circuit Court initially denied Randall's petition. Nevertheless, because Randall's § 2254 Petition is more than five years late, the Court assumes without deciding that the limitations period began to run again on September 24, 2009.

procedural default, should not be granted casually." Wilson v. Greene, 155 F.3d 396, 404 (4th Cir. 1998) (citations omitted). Here, the Court reviews Randall's arguments under the more lenient standard for gateway actual innocence claims, because subscribing to Randall's actual innocence claims would permit the Court to consider the merits of his otherwise time-barred habeas petition.

A gateway claim requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Id. If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial'" and determines whether the petitioner has met the standard for a gateway claim of innocence. House v. Bell, 547 U.S. 518, 538 (2006) (quoting Schlup, 513 U.S. at 327– 28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Sharpe v. Bell, 593 F.3d 372, 377

(4th Cir. 2010) (quoting Schlup, 513 U.S. at 327-28). "The
Court need not proceed to this second step of the inquiry unless
the petitioner first supports his or her claim with evidence of
the requisite quality." Hill v. Johnson, No. 3:09cv659, 2010 WL
5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing Weeks v.
Bowersox, 119 F.3d 1342, 1352-53 (8th Cir. 1997); Feaster v.
Beshears, 56 F. Supp. 2d 600, 610 (D. Md. 1999)). Moreover,
"actual innocence" means factual innocence and not just legal
insufficiency." See Calderon v. Thompson, 523 U.S. 538, 559
(1998) (citations omitted) (internal quotation marks omitted)
("[T]he miscarriage of justice exception is concerned with
actual as compared to legal innocence.")

## B. Compelling Evidence Exists Of Randall's Guilt

While the evidence against Randall introduced at trial was
not overwhelming, compelling evidence of his guilt existed to
support the jury's verdict. The Court notes that Randall's
trial lasted several days, involved the testimony of many
witnesses who placed Randall in West Point around the time of
the shooting, and involved extensive cross-examination and
attempts to discredit the Commonwealth's witnesses by Randall's
trial counsel. The jury heard testimony from Forrest Scott, the
only witness to the shooting of Craig Robinson, who identified
Randall as the shooter. Darryl Moody and Jerrard Crump,
Randall's co-conspirators in the plan to rob Forrest Scott,

testified that robbing Scott was Randall's idea, the three men had planned the robbery during the course of the day, and that they picked Randall up in Richmond and brought him to West Point where Randall remained until Moody and Randall approached Scott to rob him.   Rosemary Davis, a house mate of Forrest Scott's, and Moody's sister-in-law, Trevonda King, testified that they saw Randall in West Point with Moody and Crump around the time of the shooting.   The Court now turns to the evidence presented at trial.

C.   **Summary Of Evidence Of Randall's Guilt**

On the evening of October 14, 2005, Forrest Scott and his cousin were sitting in a car smoking marijuana in a vacant lot near Scott's house at 1420 Kirby Street in West Point, Virginia, and Scott saw two people walking past the car toward 14th Street.   (Aug. 30, 2006 Tr. 202, 208, 213, 215, 224, 251.) Scott testified that "[o]ne of [the two men] looked like Darryl [Moody][4] and he had a black [ski] mask on" and the second "dude was brown skinned.   He was about five, around six feet.   He had a plaid jacket on, black jeans."   (Aug. 30, 2006 Tr. 213.) Scott could tell it was Darryl Moody because "he walk[s] with a limp."   (Aug. 30, 2006 Tr. 214.)   Scott's cousin then left,

---

[4] Scott acknowledged that he "knew" Darryl Moody (Aug. 30, 2006 Tr. 227), as he had sold drugs to Moody for a couple of years.   (Aug. 30, 2006 Tr. 212.)

Craig Robinson arrived, and Scott and Robinson left for the car wash. (Aug. 30, 2006 Tr. 259.)

At some point, Robinson and Scott returned from the car wash and Floyd Green, Scott's cousin, asked Scott if he had any marijuana. (Aug. 30, 2006 Tr. 258-59.) Scott sent him to Robinson. (Aug. 30, 2006 Tr. 259.) Scott and Robinson walked to Hardee's to get chicken and a drink around 9:10 p.m. (Aug. 30, 2006 Tr. 215-16.) After buying food at Hardee's, Scott and Robinson walked back to Scott's car and Robinson got in on the passenger side. Scott stood on the driver's side. Both car doors were open. (Aug. 30, 2006 Tr. 217.)

Approximately five minutes later, or approximately twenty to thirty minutes after Moody first walked by, a man walked up and asked Robinson for marijuana as he sat in the car with his feet on the ground. (Aug. 30, 2006 Tr. 218-19, 249.) Robinson did not have any. (Aug. 30, 2006 Tr. 218.) The man then "pulled out the gun and racked the chamber . . . (Aug. 30, 2006 Tr. 218), and then placed the gun near Robinson's head. (Aug. 30, 2006 Tr. 219.) The man "said I'm going to shoot you if - - and then [Robinson] charged him and the gun went off." (Aug. 30, 2006 Tr. 218-19.) Scott heard only one shot fired. (Aug. 30, 2006 Tr. 220.) Scott tried to reach for his .380 caliber gun that was not loaded and was between the seats. (Aug. 30, 2006 Tr. 220-21.) Scott "ducked around beside the car and [then

10

he] got up. [Robinson] was laying on the ground, the dude was gone." (Aug. 30, 2006 Tr. 219.) Robinson was face first on the ground and was not moving. (Aug. 30, 2006 Tr. 226.)

Just prior to the shooting, Scott saw Darryl Moody standing across the street behind a van. (Aug. 30, 2006 Tr. 222.) After the shooting, Moody was gone. (Aug. 30, 2006 Tr. 226.)[5] Scott identified Randall as the shooter in the courtroom. (Aug. 30, 2006 Tr. 223.)[6]

Scott called 911 after the shooting. (Aug. 30, 2006 Tr. 229.) Scott spoke with Special Agent A. J. Spencer of the Virginia State Police Bureau of Criminal Investigations and explained that the shooter was about "six feet, slim. He was brown skinned. He had, like, 'Chinky' eyes" or "Chinese eyes," and corn rows. (Aug. 30, 2006 Tr. 228, 254.) Scott explained that Agent Spencer first showed him two photo arrays. (Aug. 30, 2006 Tr. 231.) One person in the first lineup looked like the shooter because he had braids and "'Chinky' eyes." (Aug. 30, 2006 Tr. 231-32.) Several days later, Agent Spencer brought a third photo array to Scott. (Aug. 30, 2006 Tr. 233.) At first, Scott did not identify anyone in the array. Scott asked to see the photos again because he recalled that the shooter had

---

[5] Scott also testified that earlier in the week he observed Moody driving by Scott's house several times. (Aug. 30, 2006 Tr. 250.)

[6] At the time of the shooting, Scott did not know Randall's name. (Aug. 30, 2006 Tr. 223.)

11

braids, and none of the individuals in the photos had braids. (Aug. 30, 2006 Tr. 234.) Scott then picked out an individual as the shooter, although that individual no longer had braids, and confirmed that the individual in the photograph was the same person Scott identified in the courtroom as Randall. (Aug. 30, 2006 Tr. 235.) Scott testified that he was certain that Randall was the individual who shot Robinson. (Aug. 30, 2006 Tr. 270.)

Darryl Moody testified that he and Jerrard Crump were friends and neighbors and they saw each other nearly every day. (Aug. 30, 2006 Tr. 285.) Moody had known Forrest Scott for several years and Moody purchased drugs from Scott. (Aug. 30, 2015 Tr. 286.) Moody met Morris Randall through friends about two weeks prior to the shooting and he knew him only as "Dee." (Aug. 30, 2006 Tr. 288.) On October 14, 2005, Moody and Crump went to Eric Berkley's house and Moody spoke with Berkley about robbing Forrest Scott. (Aug. 30, 2006 Tr. 324, 400-01, 406-07.) Berkley's role in the robbery was to engage Scott in conversation (Aug. 30, 2006 Tr. 401-02) and to "[get] Mr. Forrest out of the house." (Aug. 30, 2006 Tr. 324-25, 327.) Although Berkley was involved in planning the robbery, Berkley "never showed up" to commit the planned robbery. (Aug. 30, 2006 Tr. 326, 412-13.) At some point, Crump received a phone call from Randall. (Aug. 30, 2006 Tr. 287, 289, 325.)

12

Crump confirmed that he and Moody met on October 14, 2005
to discuss going to West Point to rob Forrest Scott. (Aug. 30,
2006 Tr. 374-75.) Crump met Randall through Moody a few days
before the shooting, and knew him only as "Dee." (Aug. 30, 2006
Tr. 377-78.) Crump explained that Randall came up with the idea
to rob Scott because he "needed 1100 dollars to pay a bill."
(Aug. 30, 2006 Tr. 375, 379.)

Moody and Crump picked Randall up at East Gate Mall on
Laburnum in Henrico County around 6:30 p.m. (Aug. 30, 2006 Tr.
290-91, 378, 418.) Crump drove to West Point where Scott lived.
(Aug. 30, 2006 Tr. 293, 381-82.) Crump parked the car on 15th
Street and Randall and Moody walked from 15th Street to 13th
Street (Aug. 30, 2006 Tr. 294, 382), but "[t]here was nobody out
there." (Aug. 30, 2006 Tr. 294.) Moody wore a hat with no bill
"pulled down." (Aug. 30, 2006 Tr. 297.) The hat had no face
mask. (Aug. 30, 2006 Tr. 332.) A few minutes later, Moody and
Randall called Crump to pick them up, and at that time, Crump
assumed the robbery had taken place. (Aug. 30, 2006 Tr. 297,
382-83.) Instead, when Crump picked them up, "Randall was
pleading his case that he wasn't going home broke. And Mr.
Moody was pleading his case stating that they had recognized
him. They knew who he was." (Aug. 30, 2006 Tr. 383.)

Crump then drove to Moody's sister-in-law, Trevonda King's,
home in West Point. (Aug. 30, 2006 Tr. 297-98, 384-85.) King

13

confirmed that Moody, Crump, and a man she did not know came to her house around 8:00 p.m. and stayed for about ten minutes (Aug. 30, 2006 Tr. 345-46, 353.) Moody and Crump seemed agitated or nervous. (Aug. 30, 2006 Tr. 346-47.) Moody wore black pants, black shirt, and a black hat, and the third man wore an army fatigue jacket, a fatigue hat, and his hair was in braids. (Aug. 30, 2006 Tr. 345, 347, 353.)[7] King identified Randall in the courtroom as the man who came to her house with Crump and Moody. (Aug. 30, 2006 Tr. 348.)

The three men stayed only a few minutes and then drove back by the vacant lot (Aug. 30, 2006 Tr. 300, 385-86), to "proceed with the robbery." (Aug. 30, 2006 Tr. 386.) Crump parked the car in the same spot as earlier. (Aug. 30, 2006 Tr. 300.) Randall and Moody got out of the car and walked to the intersection of Kirby Street and 15th Street. (Aug. 30, 2006 Tr. 301, 388.) Randall crossed the street and "went on the side of the house to talk to somebody" but Moody stayed across the street near a van. (Aug. 30, 2006 Tr. 302.) Rosemary Davis was in the van. (Aug. 30, 2006 Tr. 303, 359.)

Rosemary Davis testified that she lived in the same house as Forrest Scott and his family on 1420 Kirby Street in West Point. (Aug. 30, 2006 Tr. 358.) On the evening Robinson was

---

[7] Crump testified that Randall wore dark jeans and boots, a fatigue jacket, and a black cap, and did not have braids. (Aug. 30, 2006 Tr. 414.)

shot, near dark, a friend picked Davis up in a van that was parked on 14th and Kirby Streets. (Aug. 30, 2006 Tr. 359, 362.) As Davis got inside the van and fastened the seat belt, she saw Moody on the sidewalk near the passenger-side window across the street from the vacant lot. (Aug. 30, 2006 Tr. 362.) The van made a u-turn toward 15th Street and Davis heard a loud pop, or a gunshot. (Aug. 30, 2006 Tr. 364-65.) Davis saw "this young boy running from across here and met [Moody] at the corner and they ran down towards 15th Street . . . ." (Aug. 30, 2006 Tr. 365.) The man "ran across from where the vacant lot is where Forrest Scott and [Robinson's] car was parked." (Aug. 30, 2006 Tr. 367.) The man "had on dark clothing" and either a "wave cap or something, or plaits, but it was something like shoulder length on his head." (Aug. 30, 2006 Tr. 366.)

Moody testified that he started to walk back to Crump's car, the van had pulled away, and Moody heard one gunshot. (Aug. 30, 2006 Tr. 303.) Crump also heard the gunshot a few minutes after Moody and Randall left the car. (Aug. 30, 2006 Tr. 389.) Moody ran back to the car and he looked back and saw Randall running behind him. (Aug. 30, 2006 Tr. 304.) Moody asked Randall what had happened and Randall responded that "[Robinson] tried to attack me." (Aug. 30, 2006 Tr. 304.) Crump testified that Moody told Randall "that [Moody] had [Randall's] back and was protecting him while this took place."

15

(Aug. 30, 2006 Tr. 390.) Moody told Crump to drive to Richmond "just to get out of the area." (Aug. 30, 2006 Tr. 390.) Randall "was saying we have to take this to our grave." (Aug. 30, 2006 Tr. 390.) Moody asked Randall twice if he shot the individual, and Randall finally responded that "he said he didn't have any other choice, because he resisted the robbery." (Aug. 30, 2006 Tr. 391.)

The men drove to Chesterfield County to pick up Kayla Spradlin, a female friend of Crump's. (Aug. 30, 2006 T. 305, 392.) After picking up Spradlin, Crump dropped Randall off on Route 60 in the Seven Gables apartments behind the YMCA in Sandston. (Aug. 30, 2006 Tr. 306, 392; Sept. 1, 2006 Tr. 27-28.) Moody and Crump identified Randall in the courtroom. (Aug. 30, 2006 Tr. 306, 395.) Moody never saw Randall or Crump with a gun. (Aug. 30, 2006 Tr. 307.) Crump also testified he never saw a gun. (Aug. 30, 2006 Tr. 391.)

Agent Spencer testified that he was assigned to work the alleged shooting and murder of Craig Robinson, in West Point, Virginia on October 14, 2005. (Aug. 30, 2006 Tr. 103.) Agent Spencer identified Jerrard Crump, Darryl Moody, and Morris Randall, Jr., who was known as "Dee," as suspects. (Aug. 30, 2006 Tr. 103, 124.) Agent Spencer reviewed cell phone records and determined that Dee (x6623), Crump (x6608), and Moody (x9110) made calls to one another on the evening of October 14,

16

2005. (Aug. 30, 2006 Tr. 124, 127.)[8] The phone records demonstrated that no phone calls were made or received from Dee's phone after 9:03 p.m. and before 9:43 p.m. (Aug. 30, 2006 Tr. 128.) The shooting occurred roughly between 9:10 and 9:43.[9] The firearm used in the shooting was not located. (Aug. 30, 2006 Tr. 129.)

On the morning of Sunday, October 16, 2005, Agent Spencer spoke with and arrested Crump and Moody at Moody's parents' house. (Aug. 30, 2006 Tr. 309-10, 394.) Crump learned that the police were looking for him so he turned himself in. (Aug. 30, 2006 Tr. 394.) Crump provided Agent Spencer with the name Dee and Agent Spencer learned that Dee was Randall on following day. (Aug. 30, 2006 Tr. 155.) Moody admitted at trial that he made untruthful statements to Agent Spencer because he was "scared" and he "didn't want to be involved with it," but that he

---

[8] Moody and Crump confirmed that these telephone numbers belonged to them (see Aug. 30, 2006 Tr. 285, 374, 376) and Randall confirmed that the phone he used belonged to Ethel Braxton. (Sept. 1, 2006 Tr. 94-95.) Moody, Crump, and Randall made several phone calls to each other that afternoon. (Aug. 30, 2006 Tr. 308, 376-77.)

Agent Spencer reviewed cell phone records and determined that Dee called Crump on October 14, 2005 at 11:01 a.m. and the call lasted until 11:13 a.m. (Aug. 30, 2006 Tr. 124.) At 5:02 p.m., Dee called Moody and then Crump called Dee. (Aug. 30, 2006 Tr. 127.) At 6:31 p.m., Dee called Crump. (Aug. 30, 2006 Tr. 127.) At 9:03 p.m., Dee received a call from the number 804-737-9242, and at 9:43 p.m. Dee made a call to that same phone number. (Aug. 30, 2006 Tr. 128.)

[9] Agent Spencer testified that he found a Hardee's receipt in Forrest Scott's car reflecting the purchase time as 9:10 p.m. (Aug. 30, 2006 Tr. 118.)

eventually told the truth.  (Aug. 30, 2006 Tr. 310-11.)  Moody
pled guilty to first degree murder or homicide, conspiracy to
commit robbery, and attempted robbery related to the events of
October 14, 2005.  (Aug. 30, 2006 Tr. 312-13.)  Crump testified
that he had been indicted for crimes involving the death of
Craig Robinson, but that he had not had his trial.  (Aug. 30,
2006 Tr. 372, 396.)

     The police fugitive team arrested Randall at the home of
Ethel Braxton in Henrico County on October 18, 2005.  (Aug. 30,
2006 Tr. 149.)  Later that day, Agent Spencer spoke with Randall
and explained that Crump and Moody had admitted to their
involvement in the murder of Craig Robinson and that they had
implicated Randall.  (Aug. 30, 2006 Tr. 150.)  Randall denied
any knowledge of the murder, but stated that he had known Moody
for a long time and sold him crack cocaine and marijuana.  (Aug.
30, 2006 Tr. 150-51.)  Agent Spencer asked him about the
homicide, and Randall "simply replied he has a rock solid
alibi."  (Aug. 30, 2006 Tr. 151.)  Agent Spencer asked him about
his alibi and Randall stated "it was not important."  (Aug. 30,
2006 Tr. 151.)

     On October 21, 2005, Forrest Scott identified Randall, as
the third individual involved in the shooting, from a photo
array line-up.  (Aug. 30, 2006 Tr. 134-35, 144-46.)

18

### D.   Randall's Defense At Trial

Hattie Mae Williams testified that she knew Randall through her grandson's mother, Jamila Chamblis.   (Sept. 1, 2006 Tr. 72.)[10]   Williams testified that Randall was at her home in Whitcomb Court in the East End of Richmond "around" October 14, 2005, although she could not remember the exact date, at approximately 7:00 p.m.   (Sept. 1, 2006 Tr. 73.)   Williams testified that the day Randall came over was Jamila's father's birthday.   (Sept. 1, 2006 Tr. 81.)   Randall made a phone call from her house, a few minutes after 7:00 p.m.   (Sept. 1, 2006 Tr. 86.)   Williams and a friend gave Randall a ride to Chamblis's house in Sandston around 10:00 p.m.   (Sept. 1, 2006 Tr. 76, 78-79.)   The Commonwealth called Jamila Chamblis to testify that her father's birthday was February 22 not October 14.   (Sept. 1, 2006 Tr. 132.)

Randall testified that around October 14, 2005, he made calls to and received calls from Moody and Crump that were "strictly drug deals."   (Sept. 1, 2006 Tr. 95.)   Randall told Crump that he "had some weed" and "[t]hey told me they were going to come up, meet with me" at the Fairfield Commons Mall[11]

---

[10] The Court corrects the spelling of Jamila Chamblis's name in quotations from the record to reflect how Chamblis herself spelled her name at the beginning of her testimony.

[11] The Court notes that Eastgate Mall and Fairfield Commons are the same mall.   The mall was renamed Fairfield Commons in 1990.   See Randy Hallman, Walmart Supercenter to anchor new

because Randall did not have a car. (Sept. 1, 2006 Tr. 96-97.) Randall left the mall with Moody and Crump and the three men drove to Seven Gables apartments to buy crack for Moody, and then drove to Hattie Mae Williams's home. (Sept. 1, 2006 Tr. 98-99.) Randall testified that Crump and Moody dropped Randall off at Williams's home. (Sept. 1, 2006 Tr. 100.) Randall sat on the porch of Williams's home to hide that he was selling drugs. (Sept. 1, 2006 Tr. 100.) Randall used Williams's phone to call Jamila Chamblis who came over to Williams's soon thereafter. (Sept. 1, 2006 Tr. 100-01.) Chamblis and Moody had a child together before she began dating Randall. Chamblis became angry when Randall told her that he had been with Moody, so Randall left Williams's house, and when he returned, Chamblis was gone. (Sept. 1, 2006 Tr. 101, 115-16.)

Randall testified that he stayed at Williams's house for about an hour from approximately 9:00 p.m. until 10 p.m. (Sept. 1, 2006 Tr. 102.) Around 10:00 p.m., Williams and her boyfriend drove Randall to Chamblis's house in Sandston where Randall stayed overnight. (Sept. 1, 2006 Tr. 103-04.) Remarkably, Chamblis did not testify to support Randall's alibi.

Randall testified that he never had corn rows but wore his "hair out" at the time of his arrest photograph, never shot

---

eastern Henrico center, Richmond Times-Dispatch, (June 26, 2014 10:30 p.m.), http://www.richmond.com/business/article_4ea91787-39e6-5de6-9e4f-d4c4afa519a6.html (last visited July 31, 2015).

20

anyone in West Point on October 14, 2015, never discussed a robbery with Crump or Moody, and was not in West Point on October 14, 2005. (Sept. 1, 2006 Tr. 105-06.) Randall testified that Moody and Crump mentioned to Randall that they had a "beef" with "some individuals out there." (Sept. 1, 2006 Tr. 124.) When asked about his refusal to tell the officers about his alibi, Randall explained that he told the officers who interviewed him that his alibi was not important "because they had already told me I was charged. And I knew anything I said whatsoever would have been turned around and used against me." (Sept. 1, 2006 Tr. 126.)

## E.  Randall's Evidence Of Innocence

Instead of arguing actual innocence independently as a basis for overcoming the statute of limitations, Randall incorporates his innocence argument into his substantive Sixth Amendment claims. Randall argues that counsel rendered ineffective assistance by not obtaining certain witness testimony or telephone records that would show he was actually innocent. Respondent also addresses Randall's claims of innocence in the context of his substantive ineffective assistance claims. For example, Randall first argues that counsel failed to investigate Floyd Green, Eric Berkley, Sidney Travors, and Charles Surles "to determine if matters of defense could be developed" that would have demonstrated that he was

21

actually innocent of the crimes. (See Mem. Supp. § 2554 Pet. 4, 8 (capitalization and emphasis corrected).) In support of his claim, he provides the affidavit of Floyd Green (Mem. Supp. § 2254 Pet. Ex. D, at 1-2 ("Green Aff.")), and the affidavit of Charles Surles, executed on February 20, 2007, during the pendency of Randall's direct appeal (Id. Ex. E, at 1 ("Surles Aff.")). Randall also argues that counsel failed to obtain the cell phone records of his girlfriend, Jamila Chambliss. Randall claims that the phone records would have corroborated the testimony of Randall's alibi witness, Hattie Mae Williams, and established that Randall was in the City of Richmond on the night of the shooting and made a phone call from her home to Chamblis, and therefore was not in West Point. (Id. at 12-13.) Randall now submits Jamila Chambliss's phone records as evidence of his innocence. (Id. Ex. F, at 1.)

In order to determine whether his purported actual innocence excuses Randall's untimely filing of the instant § 2254 Petition, thereby allowing the Court to reach the merits of his Sixth Amendment claims, the Court must extricate the three pieces of evidence from the Sixth Amendment claims. The Court must independently examine this evidence to determine whether it is "new reliable evidence . . . that was not presented at trial." Schlup, 513 U.S. at 324. As discussed in

22

greater detail below, Randall's new evidence is more confusing than compelling.

### 1. Affidavit Of Floyd Green

Randall's claim of actual innocence is first founded on the affidavit of Floyd Green, executed on March 21, 2011, five years after Randall's convictions. (Green Aff. at 2.) Green was incarcerated with Randall at Nottoway Correctional Center and claims to have been with Randall's co-defendants on the night of the murder and robbery of Craig Robinson. In his affidavit Green vaguely suggests that Eric Berkley is actually the individual who shot Craig Robinson:

> . . . I stopped at Eric's house, which was about 4:00 p.m. and Sidney was there with him in the yard washing his vehicle. Eric told me that Darryl Moody and his friend, Crump stopped by earlier that day, talking about confronting Forrest about some beef and they wanted everybody to roll out with them . . . . Plus Eric had already told me that he wanted to beat Forrest up because he ran Eric's wife off the road, so I agreed to go with him . . . .
>      Later that evening, I went back to Eric's house. . . . I ro[de] with Charles, Sidney, and Eric, while Darryl and Crump was in their vehicle. When we got to West Point . . . we dropped Charles off at Academy Apartments, and me, Sidney and Eric went to Hardee's. . . . Eric and Sidney went in Hardee's, while I stayed in the vehicle. That's when I seen [sic] Forrest and I asked him where the weed was. He said Craig got it . . . .
>      . . . Eric and Darryl decided that they was going to Forrest's crib together, so we parked at a cut where you can see the railroad tracks around the corner from Forrest's house. Eric and Darryl said they was [sic] going to check the scene out. . . . Eventually Eric and Darryl came back to where we were parked and said they didn't see anybody, . . . so I

23

got upset, told Eric he had a chance to get Forrest at Hardee's. . . .

. . . That's when I got very frustrated . . . because Eric wanted me to ride out with him to fight Forrest, who he had a chance to get earlier, but he didn't, so I told him to take me home. That's when we parked in the same place that we parked at before, around the corner from Forrest's house where you can see the railroad tracks, and Eric said hold up. That him and Darryl was going to check the scene out, and I was like for what, Charles already told him that only Forrest and Mark was out there. Just go and beat him up . . . . So Eric and Darryl went toward Forrest's house, and Sidney and I stayed in the vehicle listening to some music. Crump stayed in the other vehicle. Minutes later, Darryl and Eric came back running. Eric told me and Sidney to take the vehicle back to his house . . . and he jumped in the vehicle with Darryl and Crump without telling us what happened. . . .

Next day when I seen [sic] Eric, he told me not to say nothing to nobody, so I didn't because I didn't want any trouble for myself or my family.

Prior to meeting Morris Randall at Nottoway Correctional Center, I did not know him, and never seen him before. Morris was not with us when we went to Forrest's house, and he was not a passenger in the vehicle Moody and his friend were riding in.

(Green Aff. 1-2.)[12]

---

[12] Scott testified that he knew Eric Berkley. (Aug. 30, 2006 Tr. 257.) Scott saw Berkley on October 14, 2005 at Hardee's with Scott's cousin, Floyd Green, and several other people who he could not identify because they were in the back of a car. (Aug. 30, 2006 Tr. 257.) Scott admitted that around the time of the shooting he and Berkley "had some issues . . . . over a girl." (Aug. 30, 2006 Tr. 258.) Scott testified that he was "[p]ositive" Eric Berkley did not shoot Robinson. (Aug. 30, 2006 Tr. 273.)

## 2.    Affidavit Of Charles Surles

Randall also submits the affidavit of Charles Surles, executed on February 20, 2007. In his affidavit Surles represents, in relevant part:

> On the day Craig Robinson was killed, Eric Berkley came by my house and told me that Darryl Moody and a dude named Crump had just left his house and they were going to West Point later that night to confront Forrest Scott about a beef they had with each other. We left my house and went to where Eric lives . . . .
>
> . . . We chilled at Eric's house for a little while and then Sidney and Floyd Green stopped by. A few hours pas[sed] and Darryl Moody and Crump came back to Eric's house right before dark. Eric wanted me to go with them to Forrest's house so that I could check out the area to see if anybody was out there with Forrest. . . .
>
> Floyd and Sidney ro[de] with me and Eric, Moody and Crump rode in a separate car. When we got into West Point we went straight to Pilot[ ] Gas station. I got out and walked to Forrest's house which is around the corner from Pilot, while they sat in the parking lot. When I got out there I saw Forrest, Mark . . . and my mother Rosemary Davis. . . . I walk back to Pilot and had Eric take me to Academy Apartments. . . . I told them who was out there and they dropped me off. . . . Eric, Sydney, Floyd, Moody and Crump came back to the apartments and they told me they went out there but nothing happened and wanted me to check out the area for them again so I rode back with them.
>
> When I went out there the second time Forrest and Mark Gordon was the only two I saw. . . . Eric took me back to the Academy to drop me off, Moody and Crump followed. After I was dropped off a few minutes past and I called my mom. As I was talking to her she told me she was pulling off and then she said she heard a gunshot and the phone went dead.

(Surles Aff. 1.)

25

### 3. Phone Records

Finally, Randall submits the phone records of Jamila Chamblis. The record shows that at 7:37 p.m. on October 14, 2015, Chamblis received a call from the phone number 804-516-0432. (Mem. Supp. § 2254 Pet. Ex. F, at 1.) Randall claims this is "the same number that Ms. Williams provided to the private investigator as belonging to her at the time." (Mem. Supp. § 2254 Pet. 14.) Randall admitted during the hearing on his Motion for a New Trial that he had Chamblis's phone records in advance of trial. (Oct. 4, 2006 Tr. 15.) Moreover, as explained below, Chamblis's phone records largely refute Randall's alibi.

### F. Reliability of Randall's Evidence

The Supreme Court has explained that to be credible, three types of "new reliable evidence" may support a petitioner's allegations of innocence. Schlup v. Delo, 513 U.S. 298, 324 (1995). These include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. Randall's new evidence fails to fall into any of these categories.

Randall clearly offers no new exculpatory scientific evidence. To the extent Chamblis's phone records are "physical evidence," these records are certainly not "critical" as further discussed infra Part III.E. Finally, the affidavits Randall

submits in support of his innocence are not "trustworthy eyewitness accounts." Schlup, 513 U.S. at 324. Neither Green nor Surles were eyewitnesses to the attempted robbery of Forrest Scott or the shooting of Craig Robinson. At most, these affidavits are vague statements from other felons that hint that a new individual, Eric Berkley, may have killed Robinson. Neither Randall, nor either of the affiants, has stated who shot and killed Craig Robinson if Randall did not. At most, Randall faults counsel for failing to investigate Berkley "as [a] potential suspect[ ]," but does not state that Berkley was the shooter. (Traverse 3, ECF No. 20.) Randall offers no competent evidence that Berkley was the individual who shot Robinson. Thus, it is doubtful that Randall makes a showing that his evidence is "new reliable evidence" for this reason alone.

Further, the Court has doubts about the credibility of Randall's affidavits in support of his claim of innocence. The Supreme Court has instructed that

> when considering an actual-innocence claim in the context of a request for an evidentiary hearing, the District Court need not "test the new evidence by a standard appropriate for deciding a motion for summary judgment," but rather may "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."

House, 547 U.S. at 537 (quoting Schlup, 513 U.S. at 331-32.) The affidavits Randall produces as evidence of his innocence lack the ring of truth. Both affidavits were made after the

27

conclusion of Randall's criminal trial and are made by individuals with felony convictions. Charles Surles is currently incarcerated. Floyd Green admits that he was incarcerated with Randall prior to making the affidavit. The sheer fact that both affiants have a history of felony convictions casts doubt on the reliability of their testimony.

Additionally, the notarization on each affidavit is of dubious authenticity. Both lack any visible seal or stamp and are entirely handwritten. The notarization on Green's affidavit lacks any indication of where or when the notarization took place.[13] On Surles's affidavit, the notary's handwritten date, name, and place of notarization looks strikingly like Randall's own handwriting when compared to his submissions.

Despite the Court's doubt about the reliability of these affidavits, even considering this new evidence along with the evidence put forth at trial, many a reasonable juror would have found Randall guilty. See Sharpe, 593 F.3d at 377.[14]

_____

[13] As of 2009, every notarial act must contain: 1) a notarial statement; 2) the date of the notarial act; 3) the place of the notarial act; 4) the expiration of the notary's commission; 5) the notary's signature; 6) the notary's registration number; 7) a photographically reproducible notary seal/stamp. See Va. Code Ann. § 47.1-16 (2009). In 2007, every notarization required the date, the place of the notarial act, and the expiration of the notary's commission. See Va. Code Ann. § 47.1-16 (2007).

[14] From review of the record, the Court notes that this is not Randall's first attempt at providing evidence of his innocence through statements of other individuals with whom he

28

was incarcerated. Randall has provided different evidence of
his innocence at almost every stage of his challenge to his
convictions. For example, on September 21, 2006, counsel filed
a motion for a new trial based on Randall's theory that he was
innocent. The motion was based on the potential testimony of
Mr. Ayres and Mr. Brown, who Randall was placed in segregation
with in jail. (Oct. 4, 2006 Tr. 3-4.) Counsel explained that
Brown

> would say that Mr. Moody was incarcerated in Lancaster
> County Jail and had developed a relationship
> with . . . Mr. Brown, but that Mr. Moody had told him
> that Mr. Randall was essentially, the scapegoat; that,
> in fact, Mr. Randall was not present during the
> robbery and that part of the reason that Mr. Randall
> was named, number one, was to get themselves out of
> trouble, but also because Mr. Randall had a
> relationship with Mr. Moody's baby's mother.

(Oct. 4, 2006 Tr. 4); see Motion for New Trial, Commonwealth v.
Randall, No. CR06-20(00)-(04), at 1 (Va. Cir. Ct. filed Sept.
21, 2006). Counsel explained that Mr. Ayers would testify that
Forrest Scott only "identified Mr. Randall [from the photo
lineup] just to get himself a better deal." (Oct. 4, 2006 Tr.
5); see Motion for New Trial, Randall, CR06-20(00)-(04), at 1.
Counsel confirmed that "[t]hey didn't see personally anything of
the shooting themselves. They were just repeating what Mr.
Moody told them in jail." (Oct. 4, 2006 Tr. 4.) The Circuit
Court noted that at most, this testimony would have come in at
trial to impeach the credibility of Moody and Scott. (Oct. 4,
2006 Tr. 6.) The Court denied the motion because

> these two witnesses, Mr. Moody and Mr. Forrest Scott,
> were both extensively cross-examined and issues were
> brought out to attack their credibility and diminish
> their testimony in the eyes of the jury.
>     The jury with all the evidence outside of the
> direct testimony of Mr. Moody and Mr. Scott there was
> other independent evidence that showed Mr. Randall was
> present in the immediate area. This just would have
> been, the testimony from these two new witnesses that
> the difference put forward today by the affidavits,
> would just be merely cumulative evidence toward
> further impeachment. I do not think it would have
> made any difference to the jury in the credibility
> they placed on the testimony of Mr. Moody or Mr.
> Scott.
>     It would not have changed any result in the
> outcome of the case because, at best, this would just
> be further impeachment evidence of their credibility.

29

## G.   Consideration Of All The Evidence

The sum of Randall's new evidence contained in Green's and Surles's affidavits is that neither Green nor Surles saw Randall with Moody and Crump at any time during the day of October 14, 2005, and that Eric Berkley was the individual with Moody and Crump in West Point.   Through the phone records, Randall seeks to support his alibi that he was in Richmond and not in West Point on the evening of the shooting.

Despite a veiled attempt to substitute Eric Berkley for Randall and to disavow Randall's involvement in the robbery and shooting in West Point, the affidavits and phone records fail to lend sufficient support for Randall's alibi to overcome the Commonwealth's abundant evidence of Randall's involvement in the crimes.

Four witnesses identified Randall as the individual who accompanied Crump and Moody around the time of the shooting.[15]

---

(Oct. 4, 2006 Tr. 8-9.)   Perhaps indicative of each affiant's veracity, Randall did not submit these affidavits in support of his § 2254 Petition.

[15] While Randall offers motives for several witness to lie, counsel questioned these witnesses during trial about such potential motives for their testimony.   Counsel attacked Moody's credibility based on inconsistent statements that he made to police and Moody explained that he either did not remember making such statements or that he lied initially to "save [his] ass." (Aug. 30, 2006 Tr. 322; see Mem. Supp. Mot. Dismiss Ex. 3 ¶¶ 4.3, 4.6, ECF No. 15-3 ("Johnson Aff.").)   Counsel so vigorously attacked Moody's credibility that the Court intervened and told counsel to move on because "it's clear this witness said he lied many times . . . ." (Aug. 30, 2006

Forrest Scott, the only witness to observe the shooting, identified Moody from a photo array and in the courtroom as the shooter. Scott explained that he knew Eric Berkley, and that he was "positive" that Berkley was not the shooter. (Aug. 30, 2006 Tr. 273.) Scott testified that he did not know Randall at the time of the shooting. Randall offers no persuasive reason for Scott to have lied about Randall's involvement.

Moody and Crump both testified to Randall's involvement in the plan to rob Forrest Scott. Moody and Crump testified that Randall was with them in West Point at the time of the shooting. Moody and Randall exited Crump's car, Randall left to approach Scott, both Moody and Crump heard a gunshot, and Randall and Moody ran back to Crump's car. Again, Randall fails to produce any believable reason why Crump and Moody would lie and place the blame on Randall.[16] Both Moody and Crump also testified that Eric Berkley was involved in the plan to rob Forrest Scott, but

---

Tr. 329.) Counsel asked Moody, Crump, and Forrest Scott about their own criminal charges or convictions and whether they had a deal with the Commonwealth in exchange for their testimony in the case. (See Aug. 30, 2006 Tr. 236, 314, 395-96.) Counsel also extensively questioned Forrest Scott about inconsistencies in his testimony about his actions at the time of the robbery, his ability to see the shooter, his drug use that night, and his identification of Randall from the photo lineup. (Aug. 30, 2006 Tr. 238-63, 271-72.) Counsel also asked Scott about a history of bad blood between Scott and Eric Berkley and Scott agreed that they had issues pertaining to a woman. (Aug. 30, 2006 Tr. 257-58.)

[16] At most, Randall claims that Moody had a child with Randall's current girlfriend. (Sept. 1, 2006 Tr. 101.)

that he failed to show up to meet them.   (Aug. 30, 2006 Tr. 324-37, 400-03, 406-07, 412.)   Thus, the jury knew about Berkley's involvement in the planned criminal activity, but was persuaded after hearing all of the evidence that Randall, not Berkley, shot Robinson.

Trevonda King also identified Randall as the man who accompanied Moody and Crump in West Point around the time of the shooting.  (Aug. 30, 2006 Tr. 348-49.)

Importantly, according to their testimony, neither Green nor Surles actually observed the attempted robbery and shooting of Craig Robinson.   Green indicates that he and someone named Sidney "stayed in the vehicle listening to some music" and then "Darryl and Eric came back running" and Eric "jumped in the vehicle with [Moody] and Crump without telling us what happened."   (Green Aff. 2.)   Green never states that Eric Berkley, not Randall, shot Craig Robinson.   At most he states "Morris was not with us when we went to Forrest's house, and he was not a passenger in the vehicle Moody and his friend were riding in."  (Id.)

Surles wholly fails to mention Randall in his affidavit and makes no statement about Randall's involvement or non-involvement in the planned robbery of Forrest Scott.   Surles offers little more than to swear that Eric Berkley was involved in the plan to rob Scott and was with Crump and Moody over the

course of the day. However, the evidence put forth at trial already established that Eric Berkley was involved in the plan to rob Forrest Scott. Additionally, Surles states that "Eric took me back to the Academy [apartments] to drop me off and Moody and Crump followed." (Surles Aff. 1.) Thus, Surles was not present at the scene of the attempted robbery and shooting. Surles provides no competent testimony to counter the compelling evidence offered at trial that Randall was the shooter.

Finally, Jamila Chamblis's phone records create more confusion than support for Randall's alibi defense. The records fail to square inconsistencies between Randall's alibi and testimony elicited at trial. For example, the evidence clearly established that Crump and Moody picked Randall up at the Fairfield Commons Mall around 6:30 p.m. Randall testified that Crump and Moody took him to Seven Gables Apartments in Sandston to obtain drugs, and then dropped Randall off at Hattie Mae Williams's home in Whitcomb Court in Richmond after 7:00 p.m. Randall states that this was his last interaction with Moody and Crump that day. (Sept. 1, 2006 Tr. 96-100.) Randall testified that Williams and her boyfriend drove Randall to Jamila Chamblis's house in Seven Gables Apartments around 10:00 p.m. (Sept. 1, 2006 Tr. 102-03.) However, contrary to Randall's testimony, Crump and Moody both testified that they, not Williams, dropped Randall off at Seven Gables Apartments in

Sandston after the shooting. (Aug. 30, 2006 Tr. 306, 392.) Kayla Spradlin, a witness who had no involvement in the criminal activity, confirmed that Moody and Crump dropped off a man at an apartment complex on Route 60 in Sandston after they picked her up. (Sept. 1, 2006 Tr. 27-28.)

In addition, the fact that Randall only submitted these phone records after trial to support his claim of innocence makes the records particularly suspect. The phone records were available at trial and Randall chose not to introduce these records in his defense. Randall contends that the records show that Jamila Chambliss received a phone call made from Hattie Mae Williams's house on October 14, 2005 at 7:37 p.m. (Mem. Supp. § 2254 Pet. Ex. F, at 1.) Hattie Mae Williams testified that she knew Jamila Chamblis because she was her grandson's mother. (Sept. 1, 2006 Tr. 72.) Arguably, the two would have had communications with one another. Thus, at most, the records indicate that a phone call occurred between the two numbers, not that Randall definitively placed this call. (Sept. 1, 2006 Tr. 72.) Williams also testified that Randall came inside her house only once and it was on Chamblis's father's birthday. (Sept. 1, 2006 Tr. 81.) Chamblis later testified that her father's birthday is February 22. (Sept. 1, 2006 Tr. 132.) Combined

with this testimony, the phone records do not prove that Randall made this phone call at 7:37 p.m. on the night of the shooting.[17]

Further examination of Chamblis's phone records also casts doubt on Randall's testimony. Randall testified that he gave Ethel Braxton's phone back to her prior to Moody and Crump picking him up at 6:30 p.m. Randall also testified that after arriving at Chamblis's house, the two "sat up basically all that night [in her apartment] for real, to be honest with you, talking and then we went to sleep. It was almost morning time." (Sept. 1, 2006 Tr. 104.) However, contrary to Randall's testimony, Chamblis's phone records indicate that Chamblis called Braxton's phone at 7:52 p.m., just eight minutes after she allegedly hung up with Randall who called from Williams's house.[18] Chamblis also made two calls to that same number at 12:51 a.m. and 12:55 a.m. although Randall was allegedly with

---

[17] Counsel explained that "[he] did not obtain telephone records for Hattie Mae Williams" but that "probably would have helped to bolster her credibility." (Johnson Aff. ¶ 4.13.)

[18] In his first habeas petition filed in the Circuit Court, Randall claimed that he made this 7:52 p.m. call to Braxton from Chamblis's phone because he and Chamblis got into an argument and he wanted Braxton to pick him up. See Petition for Writ of Habeas Corpus, Randall v. Harmon, CL07-22, Attach. at 17 (Va. Cir. Ct. filed Feb. 22, 2007). The Court notes that the phone call between Chamblis and Randall on Williams's phone lasted until approximately 7:44. A reasonable juror could infer that, if the phone call with Chamblis ended at 7:44 p.m., it would be implausible that Chamblis could have arrived at Williams's house and that Randall and Chamblis could have already fought in eight minutes from the end of that phone call.

her at that time. (Mem. Supp. § 2254 Pet. Ex. F. at 1.)[19]
Braxton's phone records were introduced at trial and reflected
more calls made between Braxton's number and Chamblis's number
than Chamblis's records indicated. This included several calls
made from Braxton's phone to Chamblis's phone around the same
times. See Petition for Writ of Habeas Corpus, Randall v.
Harmon, CL07-22, Ex. Q., at 2-3 (Va. Cir. Ct. filed Feb. 22,
2007). Thus, if the phone records had been presented at trial,
Randall's testimony may have been further discredited. A jury
could have easily concluded that Randall falsely testified that
he gave Braxton's phone back to her when Crump and Moody picked
him up in Richmond, and that he was not with Chamblis when he
testified that he stayed at her house all night. (Sept. 1, 2006
Tr. 99, 104.)

Perhaps most damning to Randall's current claim of
innocence is the absence of any testimony from his best alibi
witness, his girlfriend, Jamila Chamblis. According to Randall,
Chamblis came to Williams's house in the East End of Richmond at
some point after the end of the phone call at 7:44 p.m. but left
prior to 9:00 p.m. on the evening of the shooting. (See Sept.
1, 2006 Tr. 100-02; Mem. Supp. § 2254 Pet. Ex. F, at 1.)

---

[19] Randall claimed that he made these two calls from
Chamblis's phone to Braxton to let her know he was okay and with
Chamblis. See Petition for Writ of Habeas Corpus, Randall,
CL07-22, Attach. at 18.

Counsel explains that Chamblis was available and scheduled to testify with respect to Randall's alibi defense that he was in Richmond at the time of the shooting. Chamblis could have testified that she received a phone call from Randall while at Williams's house and that after he called, she came over to Whitcomb Court to meet with Randall. While counsel anticipated calling Chamblis as an alibi witness, Randall, not counsel, made the last-minute decision for Chamblis not to testify. Counsel explains:

> I personally believe the main problem with [Randall's] defense is that he instructed me not to call the alibi witness. I provided notice of an alibi defense. I advised the jury in my opening statement that Jamila Chamblis would be an alibi witness, and I fully intended to call her. Right before I was going to call her, Mr. Randall told me that he did not want me to call Ms. Chamblis as a witness. I told him that we had already informed the jury that she would be a witness, she was a vital part of our case, and I thought we should call her. I added that he is the one going to jail, if we lose, so I left that decision up to him. He signed a statement indicating that he did not want me to call her as a witness.
>
> Mr. Randall indicated that he had spoken to Ms. Chamblis from a jail telephone, and he thought the conversation was recorded. During the phone call, he was trying to get Ms. Chamblis to contact witnesses for an alibi defense. He later learned that he needed an alibi for a different date, because he had the wrong date for the murder. Mr. Randall thought that the Commonwealth had recorded his efforts to establish the first alibi, and it would look like he was making up the fact that Ms. Chamblis was his actual alibi.

(Johnson Aff. ¶ 4.19 (spelling corrected).) During the hearing on the Motion for New Trial, Randall admitted that he told his lawyer not to put Chamblis on the stand, stating: "[A] large

part of why I did not put Jamila Chamblis on the stand is because those phone records would have shown that in her testimony, as well as my own, that basically if they relied on the phone records [of Ethel Braxton] over our testimony, Jamila Chamblis and I would have looked like two liars on the stand." (Oct. 4, 2006 Tr. 17.)[20]  The Circuit Court aptly surmised:

> [Y]ou told your lawyer not to put Ms. Chamblis on the stand and now you feel you made a choice you wish you hadn't made and you wish you had put her on the stand.
>     That's not a basis for a new trial just because you now wish you had done a different issue and trial strategy and your lawyer followed through with that.

(Oct. 4, 2006 Tr. 18.) When asked what Chamblis would have testified to that would have changed the jury's decision, Randall explained:

> Ms. Chamblis could have testified that I had contacted her from Ms. Williams' telephone that day.  There are records of that.  She also could have testified that Ms. Williams is the one that brought me to her house at approximately 10:00 that same night, which would have not given me time to be able to be in West Point at that time and at Jamila's Chamblis's house at 10:00 p.m.

(Oct. 4, 2006 Tr. 18-19.) In denying Randall's pro se motions, the Circuit Court explained that this evidence, amongst other evidence, "is not newly discovered evidence.  This is just you want[ing] to try the case all over again.  It's like it doesn't

---

[20]  As previously discussed, the call log from Ethel Braxton's phone reflected more calls between that number and Chamblis's number, than Chamblis's phone log.

work out at first, so let's back and try some new things."
(Oct. 4, 2006 Tr. 23.)

Randall's failure to produce any sworn testimony from his main alibi witness at any point during his criminal and collateral proceedings significantly undermines the credibility of Randall's alibi defense that he was in Richmond at the time of the shooting and not in West Point.

After considering all of the evidence, Randall fails to demonstrate that based on his new evidence "'it is more likely than not that no reasonable juror would have found [Randall] guilty beyond a reasonable doubt.'" Sharpe, 593 F.3d at 377 (citation omitted). Compelling evidence of Randall's guilt exists. Four witnesses placed Randall in West Point with Moody and Crump around the time of the murder. The only witness to the shooting stated that he knew the shooter was not Eric Berkley, but was Randall. The jury heard the testimony of the Commonwealth's witnesses and found their testimony credible, and Randall's testimony about his alibi, incredible. Thus, the Court concludes Randall fails to make a sufficient showing of his actual innocence to excuse the untimeliness of his § 2254 Petition.

## IV. CONCLUSION

The Motion to Dismiss (ECF No. 13) will be granted. Randall's § 2254 Petition will be denied and the action will be

dismissed.  An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(A).  A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 & n.4 (1983)). No law or evidence suggests that Randall is entitled to further consideration in this matter.  A COA will therefore be denied.

The Clerk is directed to send a copy of this Memorandum Opinion to Randall and counsel for Respondent.

It is so ORDERED.

/s/ _REP_

Robert E. Payne
Date: _August 4, 2015_                        Senior United States District Judge
Richmond, Virginia